Nichoes, Judge,
concurring:
I concur in Judge Skelton’s opinion and in the judgment of the court. Whether plaintiff has an equitable claim is not properly before us, as it might have been had he applied to the Board for Correction of Naval Records and been turned down. Cf. Rawlins v. United States, 197 Ct. Cl. 972 (1972). The reporting tribunal in a Congressional reference case there held as to a claim much like that herein, that the Navy should have allowed Rawlins’ claim to go before such a Board. Thereby a route exists for getting equitable claims before this court without special legislation. Cf. Kaeserman v. United States, post at 1081. A refusal by a Board to correct an “injustice’ may be reversed as arbitrary and capricious although we could not grant relief directly. For reasons to be shown, however, the proof of even “injustice” would have to be clearcut in a way the instant claim probably would not satisfy. As a legal claim it manifestly fails.
*695 However, despite its weaknesses, the instant claim does trouble the conscience. The statutory selection procedures at times expose promising careers to some degree of blind chance. An officer has no way to request that his name not go before Selection Boards when he is in the “promotion zone” hut temporarily under a cloud. If he is ultimately exonerated, he may have been passed over meanwhile and have no remedy. True, the officer’s written record may have been carefully sanitized to avoid revealing the cloud. Defendant has not pointed out any regulation or instruction that bars Selection Board members from bringing into Board deliberations what they already know. They are not jurymen, directed to disregard what they have heard outside the court or read in the papers. As I understand it, use of these Boards dates back to a time when the officer corps was so small that its members all knew each other personally. A man’s word of mouth service reputation not only was allowed to be considered in the decision whether he was to be promoted, it was expected to be the decisive factor. I tried to smoke out defense counsel in this case, whether the above remains true to any extent, but do not feel completely enlightened by the responses received.
Defendant says, (Supplemental Memorandum, p. 3):
Therefore, it would appear to be appropriate to say that in its consideration of records a selection hoard would incorporate the experience in the naval service of those officers on the board and their mews as to which officers are best suited for promotion. (Emphasis supplied.) That subjective judgment is combined with the objective records in reaching a decision. Article B-2201 of the Bureau of Naval Personnel Manual (DX 9, 10) sets forth therein a list of files which compose [comprise?] an officer’s record “but is not limited to, the documents indicated.”
I take it this means that an officer’s “record” consists of (a) certain formal documents, as assembled in a file jacket for the Board, and (b) such ideas 'and impressions as members of the Board may have formed about the officer’s fitness, in course of their normal naval experience. But I find it all very vague and indefinite. Lacking knowledge of what a Selection Board “knows” of a candidate for promotion outside the file *696 jacket, we could not tell whether material in that jacket was in fact prejudicial, even if we knew what it was.
It is probably true, as we were told in one of our cases, that the hazards of destruction of a career by such blind chance are greater for the young man or woman who aspires to rise in corporate management, finance, the media, (or, God forbid the law!) than they are in the Navy. Some exposure to unmerited catastrophe seems a necessary concomitant of any occupation that provides an adequate amount of upward mobility, to attract the career-oriented person. One who is security-oriented can select the Civil Service. He cannot demand in the same career the glitter and glory of an admiral and the job security of a customs inspector.
The Selection Board system succeeded promotion by seniority, where all one needed to make admiral was a sound stomach, and a talent for staying out of jail. We don’t want that system back. Selection Boards are impartial, institutionalized and regular, in contrast to private industry, where mere whim and caprice — or raw financial power — may decide who gets the six figure salary, and who gets the axe. We don’t want that either. You could not impose due process on Selection Boards without destroying their essential character. Naval officers need to be able to rely absolutely on other officers in other ships, to believe utterly in their reports, to know exactly how they will respond to particular orders, or to possible emergencies. If naval officers have a gut feeling, based on evidence or experience, that X cannot be depended on, their own efficiency is impaired so long as X holds command rank. I would not therefore, in a judicial capacity, do anything to prevent these gut feelings from having some effect on the decision whether X is promoted or passed over, unless they infringe on constitutionally protected rights. If, as d. v. I won’t, I should have to serve as a draftee in another war, I would hate to be on board a ship whose commander owed his rank and position to the fact his Selection Board was not allowed to consider anything but a sanitized official file. Let us not forget the right of enlisted men, serving under these officers, not to be led into another Pearl Harbor.
Assuming that Mr. Brenner was passed over in light of the *697 dropping of the missile and the subsequent investigation, we do not know whether a full knowledge would have made any difference. We do not know whether any of those selected for promotion had had such misfortunes. The quota of selections for promotion might have been filled with officers under no cloud at all, not even a little one. Both Boards had the notice of the termination of plaintiff’s security clearance. There is no finding that it was ever restored. It is difficult to believe a Selection Board would ever select for promotion an officer who was not cleared for security, for whatever reason. What it adds up to, we have no showing that the actual Boards, if with imperfectly sanitized records, were more prejudiced against plaintiff than would have been (a) a Board with full God-like knowledge of everything that happened during, and as a result of, the missile dropping incident, or (b) a Board with no knowledge whatsoever except of plaintiff’s service reputation in general. This is not the clearcut showing of error that would warrant interference by a court. It does not seem to me the trial judge’s efforts to determine just what prejudicial documents were before the Boards could have led to anything determinative of the case in the circumstances that were before him, where plaintiff’s troubles were matters of common notoriety.
In Weiss v. United States, 187 Ct. Cl. 1, 408 F. 2d 416 (1969), they put in prejudicial material and left out exonerating material, as-was clearly established. The preferred alternative there would have been, not to blind the Board as to plaintiff’s troubles, or try to, but to give it the full picture, including the disapproving endorsements of the higher command on the Board of Investigation report, which had accused Weiss of currency irregularities. We so intimated. Viewing the case in retrospect, it certainly seems that any attempt to protect Weiss by keeping all references to his currency involvement out of his file jacket would have been of doubtful benefit to him, though his alleged offense had not, so far as the record showed, the word-of-mouth notoriety of Brenner’s. Our trial judge therefore was in error in saying a common feature of Brenner’s and Weiss’s cases was the “presence before the Selection Boards of derogatory material *698 that should not have been there.” Slip op. p. 7. Assuming, as the trial judge does, that our intimation in Weiss is more than ordinary dictum, it only stands for the proposition that extant derogatory material in a file jacket must be offset by likewise extant exculpatory material, of equal or greater dignity. It does not demand the seemingly hopeless undertaking of denying a Selection Board all knowledge of an officer’s involvements in alleged discreditable activities, which are matters of common notoriety.
I therefore believe the wrong, if there was one, to Brenner, is not correctible by judicial review. It lay, essentially, in legislation forcing his name before Selection Boards at a time when he was a party to an investigation not yet finalized as to top level approval of its conclusions. For the future, the prevention of injustices of this kind is a matter for Congress to weigh. There may be reasons I am not aware of, why holding back of names of those similarly situated with Brenner, for future Boards, is not feasible.